IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR-F-04-5286 OWW |
| | ) | |
| Plaintiff-Appellee, | ) | MEMORANDUM DECISION AND |
| | ) | ORDER REGARDING APPEAL FROM |
| vs. | ) | MAGISTRATE JUDGE DECISION. |
| | ) | |
| ROBERT LIN, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| _____ | ) | |

## I.   **INTRODUCTION**

Robert Lin ("Appellant" or "Lin") appeals his conviction by a magistrate judge for failure to obey a lawful order in violation of 36 C.F.R. § 2.32(a)(2).  Lin raises three issues on appeal: that the magistrate erred in determining that the order was lawful; that there was insufficient evidence to demonstrate specific intent; and, even if the order were lawful and the evidence sufficient, Lin's conduct was excused by medical necessity.  Appellee the United States of America ("Government") opposes the appeal.

## II.   **PROCEDURAL HISTORY**

The Government charged Lin by citation with violation of 36

C.F.R. § 2.32(a)(2), failure to obey a lawful order.  On September 27, 2004, Lin was found guilty after a bench trial and was sentenced to pay a $250 fine and a $10 special assessment. Lin was also placed on informal, non-reporting probation for 12 months.

Lin filed a notice of appeal on October 4, 2004, and his opening brief on January 11, 2005.  The Government filed its opposition on March 11, 2005, and Lin filed his reply on March 29, 2005.  Oral arguments were heard August 22, 2005.  The parties were provided opportunity to present additional authorities and the appeal was submitted for decision.

**III.  <u>STATEMENT OF FACTS</u>**

**A.  The Initial Encounter Between Lin & Ranger Grego**

On July 7, 2004, Lin was a passenger in a white Honda Odyssey minivan with tinted windows that was driving through the Tuolumne Meadows area of Yosemite National Park.  (Reporter's Transcript ("RT") 7-8.)  Lin's brother was the driver and Lin's wife was also a passenger.  (<u>Id.</u>)  Lin was born in China but speaks and understands English "reasonably well."  (RT 156).  Lin was 67 years old at the time of these events.

At approximately 9:00 p.m., Law Enforcement Ranger Duane Grego was traveling eastbound on Tioga Road in Yosemite.  (RT 10.)  Ranger Grego, who is a licensed paramedic, was alone, in uniform and in a marked vehicle.  (RT 6.)  He passed the minivan, which was traveling westbound on the two-lane road.  (RT 9-10.)

2

Ranger Grego turned around and paced the minivan.  After
determining that it was traveling 50 miles per hour in a 25 mile
per hour zone, Ranger Grego initiated a traffic stop.  (RT 11.)

The minivan pulled over and Ranger Grego parked his vehicle
approximately 20 feet behind it.  (RT 10.)  Ranger Grego's
vehicle was parked next to a small knoll leading into a meadow.
(Id.)  There was no artificial lighting in the area, although
Ranger Grego's high beam headlights and white lights from his
vehicle were shining toward the minivan.  (RT 18-19.)

As Ranger Grego began to call Yosemite communications with
the minivan's plates, he noticed a man, later identified as Lin,
stepping out of the passenger side of the vehicle.  (RT 12.)
Ranger Grego was concerned in part because, while traffic was
light, cars would still pass by about every 30 seconds.  (RT 13.)
Ranger Grego asked Lin to "remain in your vehicle for your safety
and mine" and told him "I'll be with you in just a moment."
(Id.)  Lin did not return to the vehicle but paced back and forth
near the minivan "pointing and yelling at me [Ranger Grego] that
I couldn't tell him what to do."  (Id.)  In response, Ranger
Grego moved to a position behind the rear bumper of his vehicle
for cover and again told Lin to get back into the minivan.  (Id.)

Lin again refused to comply.  He moved back toward the
minivan but then came back towards Ranger Grego, who had moved to
the passenger side of his patrol vehicle.  Ranger Grego described
Lin's movements as "purposeful."  (RT 35.)  Ranger Grego told Lin
"Sir, get back into your vehicle.  I'm giving you a lawful order

1  to get back into your vehicle. Do it now." (RT 14.) Ranger

2  Grego testified that this order was for "officer safety." (RT

3  15.)

4      Lin continued to approach Ranger Grego. Ranger Grego

5  withdrew his OC chemical spray (pepper spray) from his patrol

6  car and pointed it at Lin. Ranger Grego told Lin "Sir, I need

7  you to take a step back. Do not take another step forward. Get

8  back in your vehicle. Do it now." (RT 15.) Lin continued to

9  yell and point his finger at Ranger Grego, stating that Ranger

10  Grego could not tell him what to do. Lin then said that he was

11  going to wait in Ranger Grego's vehicle. (Id.) Ranger Grego

12  replied, "Sir, that's not an option. You need to get back in

13  your vehicle now." (Id.)

14      Lin continued his approach and came within a few feet of

15  Ranger Grego. (RT 15.) Ranger Grego warned Lin that he would use

16  his pepper spray if Lin did not stop approaching and again told

17  Lin to "[g]et back no [sic] your vehicle now." (Id.) Ranger

18  Grego testified that Lin pointed to the pepper spray and stated

19  "Oh, you have one of those, I have one of these." (RT 16.) Lin

20  then pulled a cylindrical object from his pocket and started

21  shaking it. (Id.) Ranger Grego testified that he could not get

22  "a good look at it" because of the lighting but that he thought

23  Lin had a personal can of pepper spray.[1] (Id.)

24

---

25      [1] Possession, carrying or use of pepper spray is prohibited
   within the park. See 36 C.F.R. § 2.4 (a)(1); 36 C.F.R. § 1.4
26  (definition of weapon includes "irritant gas device").

4

1    Lin continued to shake the object and began walking away
2    from Ranger Grego toward the minivan and down Tioga Road.   Ranger
3    Grego called for additional units to respond to the scene.   (RT
4    17.)   Ranger Grego did not draw his weapon or discharge his
5    pepper spray during the encounter.

6    Lin's version of the interaction is somewhat different.   Lin
7    is a lifelong asthmatic and take various medications for his
8    asthma.   (RT 158.)   Lin testified that on the night in question
9    he had been having trouble with his asthma, which was why his
10   brother was driving the minivan.   (RT 157.)   One of these
11   medications is taken through the use of an inhaler.   (RT 158.)
12   According to Lin, the preferred method for using an inhaler is
13   for the user to be standing up to allow the lungs to fully
14   expand.   (RT 159.)   Lin testified that he used the inhaler while
15   riding in the minivan and that he got out of the minivan after
16   Ranger Grego initiated the stop so that he could "stand up,
17   inhale the medicine" and get some fresh air.   (RT 160.)

18   Lin testified that he got out and took a few steps away from
19   the minivan but had not used the inhaler when he heard Ranger
20   Grego "order me to get back into the car."   (RT 161.)   Lin said
21   that he then turned and "struggled to walk actually rather slowly
22   toward the ranger" to explain what he was doing.   (Id.)   Lin
23   maintained that he had his inhaler in his hand the entire time,
24   and that Ranger Grego's testimony that Lin pulled something from
25   his pocket was incorrect.   (Id.)   Lin testified that he told
26   Ranger Grego "I am having asthma" and that he had a right to take

his asthma medication; Lin denied saying anything to the effect
of "you can't tell me what to do" to Ranger Grego.  (RT 161-62.)
Lin also testified that he "had to struggle to say [his] words"
and that he "struggle[d] to walk away quickly" but that it was a
slow walk.  (Id.)

Lin further testified that he walked approximately 75 feet
beyond the minivan and used his inhaler for the first time since
exiting the minivan.  (RT 16.)  After walking another 15-20 feet,
Lin turned and walked back to the minivan.  (RT 166.)

**B.  Subsequent Events**

The following facts are irrelevant to the issue on appeal
because Lin was cited for failing to obey Ranger Grego's orders
to return to the minivan.  The subsequent events are, however,
relevant to the credibility determination made by the magistrate
judge and will be included.

Ranger Kevin Harrison, who is an Emergency Medical
Technician ("EMT"), received Ranger Grego's calls for back-up and
was the next ranger on the scene.  (RT 74.)  When he arrived, the
minivan had still not been approached and, because of the
minivan's tinted windows, he was uncertain how many people were
inside.  (RT 77-78.)  At this time Lin was walking on the
shoulder of the westbound lane of Tioga Road.  (RT 77.)  Lin was
about 100 feet in front of the minivan at this time.  (Id.)

Ranger Fred Koegler, who is also an EMT, arrived immediately
after Ranger Harrison.  (RT 77, 92.)  He parked in the westbound
lane, closing it to traffic.  (RT 94.)  Ranger Grego briefed his

fellow rangers on the situation.  Ranger Grego informed them that
the minivan had not been cleared of threats and that he believed
Lin had pepper spray.  (RT 18, 94.)  Ranger Koegler approached
the minivan while the other two rangers acted as cover for him.
(RT 94-95.)  Ranger Koegler made contact with Mrs. Robert Lin and
Jan Lin, the driver.  (RT 95.)  He determined that they had no
weapons and that Lin was the driver's brother.  (Id.)

Ranger Koegler then called to Lin to return to the minivan
and Lin complied.[2]  (RT 96.)  Ranger Koegler asked Lin to place
his hands on the hood of the minivan so that Ranger Koegler could
check for weapons.  (RT 97.)  In the course of the pat down
Ranger Koegler felt a can-like object in Lin's pocket.  Ranger
Koegler described it as consistent with a small shaving can or
pepper spray, but, on pulling it out, found that it was an
inhaler and placed it on the hood of the minivan.  (Id.)  Lin
told Ranger Koegler that "I have difficulty breathing in high
elevation and I needed to get some fresh air." (RT 99.)  Ranger
Koegler gave Lin's driver's license to Ranger Grego and requested
that Lin sit in the front seat of the minivan.  Lin complied.
(RT 97, 101.)

About this time, Ranger Eric Gabriel, a law enforcement park
ranger supervisor and park medic arrived on the scene.  (RT 118-
122.)  As Ranger Gabriel stood near Ranger Koegler, Lin stepped
out of the minivan and began walking toward them.  The rangers

---

[2] Lin denied hearing the rangers' requests for him to return
to the minivan.  (RT 166.)

1  directed Lin back to the van.  Lin complied, but was

2  argumentative.  (RT 123.)

3      Ranger Grego then approached the minivan with two citations.

4  One for speeding, which was issued to the driver, and one for

5  failure to obey a lawful order, which was issued to Lin.  (RT

6  26.)  When Ranger Grego attempted to present Lin with the

7  citation, Lin interrupted Ranger Grego and argued that he should

8  not be given a citation.  (RT 27.)  Lin was yelling and leaning

9  out the passenger side window during this encounter. (RT 28.)

10 Ranger Gabriel, the supervisor, had Ranger Grego step back and

11 attempted to explain to Lin why he was being cited and the

12 procedure that would follow.  (RT 126.)  Ranger Gabriel explained

13 that the only way Lin could see a magistrate sooner than provided

14 by the citation would be if Lin were arrested.  (RT 127.)  Lin

15 eventually said he wanted to be taken to the magistrate and

16 Ranger Gabriel placed him under arrest.  (Id.)  Lin was then

17 transported to the jail by Rangers Grego and Koegler.  (RT 103.)

18     **C.  Lin's Medical Condition**

19     As mentioned, Lin has suffered from asthma since birth and

20 uses various medications to manage his condition.  (RT 157.)  Lin

21 testified that on the night in question he had used his inhaler

22 once in the minivan but felt no relief.  (RT 160.)  Lin further

23 testified that he "struggled" to walk and to speak to Ranger

24 Grego.  (RT 161-62.)  Lin did not use his inhaler outside the

25 vehicle until after the interaction with Ranger Grego and after

26 he had walked 75 feet beyond the front of the minivan.  (RT 166.)

When he returned to the minivan, Lin told Ranger Harrison that he had asthma.  (RT 81.)  However when Ranger Koegler asked Lin if he was having any problems "now" with his asthma (after Ranger Koegler found the inhaler), Lin said he was not.  (RT 100.)

None of the Rangers, all of whom have emergency medical training, observed any signs that Lin was having an asthma attack.  (RT 36, 84, 105, 129.)  Ranger Grego testified that these symptoms can include abbreviated speech, i.e. only having sufficient breath to complete short two or three word sentences, paleness in color, a bluish tinge (cyanosis) around the lips or tips of the fingers and wheezing.  Additionally, Ranger Grego testified that Lin's actions were "inconsistent" with a person having problems with asthma because Lin's movements were "purposeful.  He was moving aggressively, waving his arms, which would certainly increase a person's oxygen demand and especially since they were at altitudes, he was able to move very well, speak in full sentences, and in fact yell at me from 25 feet." (RT 35.)


**IV.  <u>JURISDICTION</u>**

A district court has jurisdiction over an appeal from a conviction before a magistrate judge pursuant to 18 U.S.C. § 3402.


**V.  <u>STANDARD OF REVIEW</u>**

A district court reviews a magistrate's factual findings for

9

clear error and its legal conclusions de novo.  <u>Quinn v.</u>
<u>Robinson</u>, 783 F.2d 776, 791 (9th Cir. 1986).  Mixed questions of
fact and law are subject to de novo review, however the factual
findings that underlie the application of the law are reviewed
for clear error.  <u>Id.</u>; <u>United States v. Prieto-Villa</u>, 910 F.2d
601, 604 (9th Cir. 1990).  Additionally, a "reviewing court must
respect the exclusive province of the fact finder to determine
the credibility of witnesses, resolve evidentiary conflicts, and
draw reasonable inferences from proven facts."  <u>United States v.</u>
<u>Hubbard</u>, 96 F.3d 1223, 1226 (9th Cir. 1996).

A claim of insufficient evidence is reviewed de novo.
<u>United States v. Carranza</u>, 289 F.3d 634, 641 (9th Cir. 2002).  A
court must determine "whether, after reviewing the evidence in
the light most favorable to the prosecution, any rational trier
of fact could have found the essential elements of the crime
beyond a reasonable doubt."  <u>Id.</u> at 641-42 (quoting <u>Jackson v.</u>
<u>Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560
(1979)).  However, an "appellant waives his challenge to the
sufficiency of the evidence by failing to move for judgment of
acquittal at the close of the government's case or at the close
of trial . . .."  <u>United States v. Archdale</u>, 229 F.3d 861, 867
(9th Cir. 2000).

Here, Lin's counsel mentioned that he thought he could move
for judgment of acquittal pursuant to Rule 29 of the Federal
Rules of Criminal Procedure (RT 147, 207), but no such motion was

made.[3]   In such a case, the sufficiency of the evidence is

reviewed "only for plain error or to prevent a manifest

miscarriage of justice."   <u>Archdale</u>, 229 F.3d at 867.

# VI.   **DISCUSSION**

## A.   Lawfulness of Ranger Grego's Orders

### 1.   Waiver

The Government argues that Lin waived the argument that

Ranger Grego's orders violated the Fourth Amendment because Lin

did not make a pre-trial motion to suppress pursuant to Rule 12

of the Federal Rules of Criminal Procedure.   Lin asserts that the

issue is not one of suppression but rather whether Ranger Grego's

order was lawful.   Under Lin's theory, if Ranger Grego's orders

violated the Fourth Amendment they were unlawful and Lin's

conviction must be reversed.   Lin is correct that a motion to

suppress was not necessary and he has not waived the lawfulness

of the orders.

### 2.   Legal Standard

Lin was convicted of violating 36 C.F.R. § 2.32, which makes

it unlawful to interfere with an agency function as follows:

> (2) Lawful order.  Violating the lawful order of a
> government employee or agent authorized to maintain
> order and control public access and movement during
> fire fighting operations, search and rescue operations,

---

[3]   Counsel stated in his closing argument "[t]hat's why I said
when the People rested, I really could make a – I think it's a Rule
29, a motion to dismiss at that point, but I think it would be more
helpful to the Court to hear all the evidence before we argue if
[sic] case."   (RT 207.)

1   wildlife management operations involving animals that
    pose a threat to public safety, law enforcement
2   actions, and emergency operations that involve a threat
    to public safety or park resources or other activities
3   where the control of public movement and activities is
    necessary to maintain order and public safety.
4

5   36 C.F.R. § 2.32(a)(2).  In <u>United States v. Goldin</u>, 311 F.3d

6   191, 194 (3d Cir. 2002), the Third Circuit stated that for an

7   order to be lawful under section 2.32(a)(2) "it must be 1) given

8   in one of the circumstances outlined in section 2.32(a)(2) and 2)

9   constitutional."

10      Ranger Grego testified to having told Lin to return to the

11   minivan six times.  (RT 13-16.)  It is unclear from the record

12   which of the six orders Lin was convicted of failing to obey.

13   Lin did not comply with any of the orders; any one of them, if

14   lawful, could support the conviction.

15      Lin does not argue that the orders were not given to redress

16   one of the statutory purposes; to wit, a law enforcement action,

17   although only the last mentioned category applies: control of

18   public movement and activities necessary to maintain order and

19   public safety.  Lin argues instead that Ranger Grego's orders

20   were unconstitutional because he was unreasonably seized contrary

21   to his rights under the Fourth Amendment.  <u>See</u> U.S. Const. amend

22   IV.  The Government argues that the orders were reasonable under

23   the circumstances and therefore lawful.

24      **a.  The Orders to Return to the Vehicle Were a**

25      **Seizure**

26      The parties did not specifically address the issue of

12

whether Ranger Grego's orders constituted a seizure.  A seizure

occurs when a police officer, "by means of physical force or show

of authority, in some way restrains the liberty of a citizen."

United States v. Chan-Jimenez, 125 F.3d 1324, 1326 (9th Cir.

1997) (citing Florida v. Bostick, 501 U.S. 429, 434, 111 S. Ct.

2382, 115 L. Ed. 2d 389 (1991)).  A restraint on liberty occurs

if a reasonable person under the circumstances would not have

felt free to ignore the order.  Id.

     Here, Ranger Grego ordered Lin to stop walking and return to

the vehicle.  This order restrained Lin's liberty and interfered

with his freedom of movement.  It was a seizure within the

meaning of the Fourth Amendment.  See United States v. Jacobsen,

466 U.S. 109, 113 n.5, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984)

(stating "meaningful interference, however brief, with an

individual's freedom of movement" is a seizure).

### b.  The Orders Were Reasonable

#### (1) The Fourth Amendment's Reasonableness Standard

     In evaluating the reasonableness of a seizure under the

Fourth Amendment, a court must balance the "nature and quality of

the intrusion on the individual's Fourth Amendment interests

against he countervailing governmental interests at stake."

Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 882, 104 L. Ed.

2d 443 (1997).  The "totality of the circumstances - the whole

picture - must be taken into account" in determining whether a

seizure is reasonable.  United States v. Cortez, 449 U.S. 411,

417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981); <u>United States v. Hernandez</u>, 313 F.3d 1206, 1210 (9th Cir. 2003).

The issue of whether a passenger may be ordered to remain in a vehicle or return to a vehicle during the course of a traffic stop has now been addressed by the Ninth Circuit. In <u>United States v. Williams</u>, No. 04-10213, filed August 16, 2005, the court held that officers have a right "to order a passenger back into an automobile that he voluntarily exited" because the concerns for officer safety outweigh the marginal intrusion on the passenger's liberty interest. Three other circuits have also addressed the issue and all three determined that an officer may order a passenger to return to and remain in a vehicle while the officer conducts the stop without running afoul of the Fourth Amendment.[4] In <u>United States v. Clark</u>, 337 F.3d 1282, 1288 (11th Cir. 2003), the court upheld an order requiring passengers return to their places in the vehicle and place their hands where the officer, who was alone, could see them. In <u>Rogala v. District of Columbia</u>, 161 F.3d 44, 53 (D.C. Cir. 1998), the court upheld an order requiring a passenger to return to a vehicle, stating that a "police officer has the power to reasonably control the situation by requiring a passenger to remain in a vehicle during a traffic stop, particularly where, as here, the officer is alone

---

[4] One state court has concluded the opposite. In <u>Dennis v. Maryland</u>, 693 A.2d 1150, *cert. denied*, 522 U.S. 928 (Md. 1997), the court found that an officer's detention of a passenger who attempted to walk away after a traffic stop was unlawful and that reasonable suspicion was required.

and feels threatened."  Last, in <u>United States v. Moorefield</u>, 111
F.3d 10, 12-13 (3d Cir. 1997), the court upheld an order
requiring the passenger to remain in the vehicle with his hands
in the air, finding that it imposed a minimal added intrusion on
the liberty of the passenger.

The decisions in <u>Williams</u>, <u>Clark</u>, <u>Rogala</u> and <u>Moorefield</u> are
all based primarily on the Supreme Court's decision in <u>Maryland
v. Wilson</u>, 519 U.S. 408, 413, 117 S. Ct. 882, 137 L. Ed. 2d 41
(1997).  In <u>Wilson</u>, the Court held that it is lawful for an
officer to order passengers to exit a vehicle during the course
of a traffic stop.  <u>Id.</u> at 415.  The Court balanced the "weighty
interest in officer safety" against the passenger's interest in
remaining in the vehicle and found that "danger to an officer
from a traffic stop is likely to be greater when there are
passengers in addition to the driver in the stopped car.  While
there is not the same basis for ordering the passengers out of
the car as there is for ordering the driver out, the additional
intrusion on the passenger is minimal."  <u>Id.</u> at 414-15.

The <u>Wilson</u> decision rested partly on <u>Pennsylvania v. Mimms</u>,
434 U.S. 106, 110, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977), in
which the Court held that the "legitimate and weighty" need for
officer safety allows an officer to order a driver to exit the
vehicle during a traffic stop.  <u>Wilson</u> also relied on the Court's
decision in <u>Michigan v. Summers</u>, 452 U.S. 692, 101 S. Ct. 2587,
69 L. Ed. 2d 340 (1981).  In <u>Summers</u>, officers had a warrant to
search a residence.  <u>Id.</u> at 693.  The officers encountered

Summers as he was leaving the residence and ordered him to return and remain there while the officers executed the warrant.  The Court assumed there was no probable cause but upheld the detention and the order, stating that the "risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation."  Id. at 702-03.

In sum, there is controlling authority expressly authorizing an officer to do what is reasonably necessary to control the situation during the course of a legitimate traffic stop, and to specifically order a passenger who has voluntarily exited a vehicle back into the vehicle.  The Ninth Circuit recognizes that any intrusion on the passenger's liberty interest is minimal.

### (2)  Analysis

Here, the totality of the circumstances include the following: Ranger Grego was alone; the minivan had tinted windows that prevented visual identification of occupants behind the front seats; a lawful traffic stop was effected for a speeding violation; the stop occurred after dark, along a two-lane road in Yosemite National Park where there was no artificial street lighting and traffic could be expected; Ranger Grego observed Lin exit the minivan; Ranger Grego observed Lin yelling at him; and Lin approached Ranger Grego with what appeared to be a canister of pepper spray.[5]

---

[5]   In admitting the inhaler into evidence, the magistrate judge found that it bore "a striking resemblance to a pepper spray

16

On the officer safety side of the balance, the Supreme Court has recognized that "a significant percentage of murders of police officers" occur during the course of traffic stops. Mimms, 434 U.S. at 110.  Even prior to any action by Lin, Ranger Grego had an interest in maintaining control of the situation and preventing unnecessary risks.  Because the van had tinted windows, Ranger Grego was unable to see how many people were inside the minivan and had no idea whether he was dealing with two people or an entire minivan full of passengers, any of whom could pose a threat to him.  See Wilson 519 U.S. at 413 ("the fact that there is more than one occupant of the vehicle increases the possible sources of harm to the officer").

Although the Supreme Court stated in Wilson, 519 U.S. at 414, that in some cases it may be better for an officer to order passengers out of a vehicle to prevent them from reaching for weapons inside the vehicle, the reverse may also be true.  Where, as here, the stop occurs after dark in a wilderness area, there is a risk that the passengers in a vehicle could employ a divide and conquer strategy, i.e. one passenger gets out, goes wandering into the meadow and circles back to attack the officer while the officer is assessing the remaining occupants of the van and dealing with the driver who was speeding.  In such a case, the officer would be unable to see and monitor the "fleeing" passenger.  See Williams, supra, (stating "[a]llowing a passenger

cannister."  (RT 215.)

17

1  or passengers to wander freely about while a lone officer

2  conducts a traffic stop presents a dangerous situation by

3  splitting the officer's attention between two or more

4  individuals, and enabling the driver and/or the passenger(s) to

5  take advantage of a distracted officer").  While it is true that

6  Lin was a 67 year old man and not, as his counsel pointed out,

7  "some rowdy teenager or gang member," in limited lighting, in a

8  remote area, with a passenger acting in an unusual manner, none

9  of this was known to Ranger Grego, who cannot be expected to

10  instantly correctly ascertain the passenger's age, status and

11  medial condition.  Ranger Grego acted reasonably in accordance

12  with accepted law enforcement procedures in seeking to control a

13  dangerous situation in a remote area.

14      Also on the public interest side of the balance is the

15  officer's legitimate interest in safeguarding members of the

16  public from road hazards that may occur during the course of a

17  traffic stop.  As Ranger Grego testified, he was concerned for

18  both his and Lin's safety with respect to traffic on the dark

19  two-lane road.  As Ranger Harrison testified and as evidenced by

20  the speeding violation for which the minivan was stopped, "people

21  go pretty fast through there, so it's [an] unsafe situation."

22  (RT 82.)

23      Ranger Grego's interest in protecting his own safety

24  increased during the course of the interaction with Lin.  Lin

25  refused to obey the initial order to return to the vehicle.  Lin

26  was yelling and waving his arms in an aggressive manner and

18

1   approached Ranger Grego with what appeared to be a canister of

2   pepper spray.  As mentioned, <u>supra</u> n.1., possession of pepper

3   spray is unlawful within a National Park.  After Lin approached

4   Ranger Grego with what the ranger reasonably believed to be

5   pepper spray, Ranger Grego had reasonable suspicion of more

6   criminal activity sufficient to detain Lin pursuant to <u>Terry v.</u>

7   <u>Ohio</u>, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).  The

8   orders to return to the van given before and after Lin approached

9   Ranger Grego were lawful and reasonable.  An officer is not

10  required to engage in an argumentative verbal confrontation with

11  an unknown person, at night, in a remote and dangerous area.

12      On the personal liberty side of the balance, requiring a

13  passenger who has not committed a wrong to return to and remain

14  in a vehicle is a minimal intrusion on that person's liberty

15  interest.  Lin's argument that there is great distinction between

16  ordering a person to exit a vehicle, which the Court in <u>Wilson</u>,

17  519 U.S. at 415, considered a "minimal" intrusion and ordering a

18  person to return to a vehicle has been laid to rest by <u>Williams</u>.

19  Lin also argues that exiting a vehicle is an "action that can be

20  complied with in literally 2 seconds" and only requires "movement

21  by the passenger of less than one foot" to get out of the car,

22  whereas it would have taken at least ten seconds to comply with

23  the order to return to the minivan.  Appellant's Opening Br. at

24  17-18.  Lin further argues that there is less of a liberty

25  intrusion when a person is asked to move from a more confined

26  area to a less confined area.

19

Lin's contentions about a passenger's rights fail to
acknowledge that a passenger is, presumably, in the vehicle by
choice and has committed to remaining, in the vehicle, at least
for the duration of the journey.  Requesting a passenger to
remain where he is imposes no additional burden on the passenger.
By contrast, the intrusion approved in <u>Wilson</u> at least required
action on the part of the passenger to exit a vehicle.  Any
intrusion on being required to remain in the vehicle during the
course of the stop is minimal.  <u>See</u> <u>Williams</u>, <u>supra</u>, ("We think
the difference in ordering the passenger back inside the car is
immaterial"); <u>Moorefield</u>, 111 F.3d at 13 (stating "[j]ust as
Court in <u>Wilson</u> found ordering a passenger out of the car to be a
minimal intrusion on personal liberty, we find the imposition of
having to remain in the car with raised hands equally minimal").

Lin's argument that it takes eight seconds longer to re-
enter a vehicle than to exit it is inconsequential.  In addition
to providing no evidence to support the assertion that a
passenger can exit a vehicle in "literally two seconds [assuming
no impairments]," that re-entering may take longer than exiting a
vehicle does not necessarily render the more time consuming
action a greater intrusion.  Particularly where the passenger's
actions in moving away from the vehicle have caused part of the
added time interval.  Ordering a passenger to re-enter a vehicle
simply requests a resumption of the prior status of sitting in
the vehicle.  The imposition of having to walk a few steps to
return to the vehicle is virtually indistinguishable from the

imposition of having to exit the vehicle at an officer's command, which was approved of in <u>Wilson</u>.  Such imposition on liberty is minimal.  <u>See</u> <u>Williams</u>, <u>supra</u>, ("an order to re-enter a car that the passenger voluntarily entered, and just exited, cannot be characterized by anything but a 'mere inconvenience'"); <u>Rogala</u>, 161 F.3d at 53 (finding no Fourth Amendment violation where officer ordered passenger to re-enter vehicle during stop).

Under the holdings of <u>Williams</u>, <u>Wilson</u>, <u>Clark</u>, <u>Moorefield</u> and <u>Rogala</u>, it was reasonable under the totality of these circumstances for Ranger Grego to order Lin to return to and remain in the minivan for officer safety and public / traffic safety concerns.  For reasons discussed below, Lin's failure to timely communicate to Ranger Grego that Lin was suffering a medical emergency at the least justifies any mistake Ranger Grego made in his evaluation of the threat Lin then posed to officer safety.  The order to restrict Lin's movement was issued to effectuate the law enforcement, statutory purpose of controlling public movement and activities to maintain order and public safety.  The order was constitutional.

**B. Specific Intent**

Lin argues in the alternative that, even if the order were lawful, the Government nonetheless failed to prove its case because the evidence was insufficient to show that Lin had the specific intent required under the statute.  Lin cites <u>United States v. Bucher</u>, 375 F.3d 929 (9th Cir. 2004) and <u>United States v. Buehler</u>, 793 F. Supp. 971 (E.D. Wash. 1992) in support of the

proposition that "[o]ne of the elements for conviction of the four subsections [of 36 C.F.R. § 2.32] is that the defendant has a specific intent to intentionally violate the law." (Appellant's Opening Br. at 24.)

The Government correctly points out that both of the cases on which Lin relies relate only to 36 C.F.R. § 2.32(a)(1). Section 2.32(a)(1) makes it unlawful for an individual to "intentionally interfer[e] with a government employee or agent engaged in an official duty . . .." 36 C.F.R. § 2.32(a)(1). This statutory language was interpreted by the courts in <u>Bucher</u>, 375 F.3d at 934, and <u>Buehler</u>, 793 F. Supp. at 974, as requiring specific intent.  There is no indication from these cases that this requirement applies to section 2.32(a)(2).

The first step in interpreting a regulation is the plain language of the regulation.  <u>Bucher</u>, 375 F.3d at 932.  Here, the plain language of the regulation states that "[v]iolating the lawful order of a government employee" is prohibited.  36 C.F.R. § 2.32(a)(2).  In contrast to subsections (a)(1), (a)(3) and (a)(4), which include the words "intentionally" and "knowingly," any mental state is omitted from the language of subsection (a)(2), implying that specific intent is not required.  <u>See</u> <u>also</u> <u>Goldin</u>, 311 F.3d at 194-95 (upholding conviction under section 2.32(a)(2) with no discussion of intent or any other specific mental state).

Lin argues that to find that of the three provisions, only subsection (a)(2) does not require specific intent, "makes no

sense." Lin's argument makes "no sense." Lin fails to explain why, when the words of two of the sections make intent an element and were well known to the drafters of the rules, a similar mental state requirement was omitted from subsection (a)(2). The omission of a mental state requirement from one of three closely related subsections is strong evidence that the drafters intentionally omitted such a mental statement requirement from subsection (a)(2). See Gozlon-Peretz v. United States, 498 U.S. 395, 404, 111 S. Ct 840, 112 L. Ed. 2d 919 (1991) (stating that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion") (quoting Russello v. United States, 464 U.S. 16, 23, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983)).

The absence of the terms "intentionally" or "knowingly" as they are used in 26 C.F.R. § 2.32(a)(1), (a)(3) and (a)(4), plainly establishes that subsection (a)(2) has no specific intent requirement. Specific intent is not an element of the offense and did not need to be proved at trial.[6]

---

[6] In United States v. Poocha, 259 F.3d 1077, 1082-83 (9th Cir. 2001), the Ninth Circuit upheld a conviction for violation of section 2.32(a)(2) where the district court found that the defendant had "intentionally fail[ed] to obey a lawful order." The court did not, however, hold that specific intent was an element of the crime, and did not comment upon the district court's determination that the violation had been intentional except to note that there was sufficient evidence to support the district court's use of the word "intentional." Id. at 1083.

Assuming, _arguendo_, that specific intent is an element of a the crime of failing to obey a lawful order, Lin's contention that the "test is whether Lin reasonably believed that it was not a lawful order" is unsupported by legal authority. (Appellant's Opening Br. at 25.)  As previously stated, the test is whether it was plain error for the magistrate to find that Lin violated a lawful order.  As discussed, the order was lawful.  The only other question is whether Lin acted intentionally.  Intent may be "inferred from the defendant's conduct and from the surrounding circumstances."  _Buehler_, 375 F.3d at 934.

The magistrate judge did not make a specific finding as to Lin's intent, but the record contains substantial circumstantial evidence of Lin's intent in the form of his purposeful, resistive, and uncooperative conduct in response to the six separate orders.  Lin admitted that he heard Ranger Grego tell him to return to the minivan, (RT 161), and admitted that he did not do so.  Instead, Lin approached Ranger Grego in what Ranger Grego perceived to be a threatening manner and then Lin intentionally walked away in defiance of Ranger Grego's commands. Lin's conduct supports the inference that Lin intentionally refused to comply with the direct order because he was unwilling to accept the officer's exercise of authority over him at the scene.  It was not plain error for the magistrate judge to convict Lin as charged.  Even assuming _arguendo_, a specific intent requirement, any rational trier of fact, viewing the evidence in the light most favorable to the Government, would

1  have found that Lin acted intentionally and defiantly to

2  vindicate his subjective view of how he should physically address

3  what Lin claims was a medical emergency by doing what Lin wanted,

4  when he wanted, and by purposefully ignoring the ranger's

5  commands.

6      Lin's conviction for failure to obey a lawful order is

7  supported by substantial evidence in that the order was lawfully

8  issued to Lin who purposefully refused to obey the order.

9      **C.  Necessity Defense**

10     Lin now concentrates his defense on medical necessity, which

11 he claims excused his non-compliance with the ranger's lawful

12 orders.  Lin asserts that the evidence is undisputed that he was

13 having an asthma attack at the time of the stop and that he chose

14 the lesser of two evils in disobeying Ranger Grego's order.

15     Necessity is an affirmative defense for which the defendant

16 must produce evidence, although the burden of proof remains on

17 the Government to establish the elements of the crime beyond a

18 reasonable doubt and overcome the necessity defense.  A trial

19 court may reject a necessity defense if the defendant's evidence

20 is "insufficient as a matter of law to support the proffered

21 defense."[7]  United sates v. Dorrell, 758 F.2d 427, 430 (9th Cir.

22

23     [7]  It is questionable whether Defendant properly raised his
   necessity defense below.  The transcript contains only a passing
24 reference to a "legal excuse," (RT 193), and it does not appear
   that Defendant specifically argued the four required elements
25 below.  Assuming, arguendo, that Defendant did raise a necessity
   defense, the magistrate judge, in finding Defendant guilty,
26 impliedly rejected the defense based on a failure of proof.

1   1985).  A trial court's rejection of a necessity defense is

2   reviewed de novo.  <u>United States v. Arellano-Rivera</u>, 244 F.3d

3   1119, 1125 (9th Cir. 2001).

4        To prove necessity, a defendant must establish:

5        (1) that he was faced with a choice of evils and chose
         the lesser evil; (2) that he acted to prevent imminent

6        harm; (3) that he reasonably anticipated a causal
         relation between his conduct and the harm to be

7        avoided; and (4) that there were no other legal
         alternatives to violating the law.

8

9   <u>Id.</u> at 1126.  If any of the four elements are not met, the trial

10  judge must grant a motion to preclude evidence of the defense.

11  <u>Id.</u>  The Government made no motion to preclude necessity defense

12  evidence.

13       On the first element, the "lesser" and more reasonable evil

14  was not for Lin to disobey the lawful order and begin yelling at

15  Ranger Grego.  The lesser evil was for Lin to disobey the order

16  and, at the same time, communicate to Ranger Grego that Lin had a

17  medical emergency and needed to use his inhaler, a task easily

18  accomplished by simply using the inhaler.  Ranger Grego denied

19  hearing any of Lin's alleged statements about Lin's condition.

20  (RT 34.)  The magistrate judge, in finding Lin guilty, chose to

21  believe Ranger Grego over Lin.  That credibility determination

22  will not be disturbed.

23       On the second element, the Government argues that Lin failed

24  to show that he acted to prevent an imminent harm because Lin

25  testified on cross examination that he was not having a full-

26  blown asthma attack and Lin believed that he was not in a "real,

26

1   real serious situation."  (RT 174.)  The Government argues that

2   all of the rangers on the scene had medical training, ranging

3   from an EMT-basic to a fully qualified paramedic.  None of the

4   rangers observed any signs or symptoms of an asthma attack.

5       Lin argues that the magistrate judge found, "you were

6   undergoing an asthma attack" (RT 211), and that the government

7   has "taken a snippet from Lin's examination to try and make the

8   events less serious than they were."  (Appellant's Reply at 14.)

9   Lin asserts that there was a "potential for imminent harm" if Lin

10  had complied with Grego's order because Lin "needed to stand and

11  remain in the open air to allow the medicine to work properly.

12  He also needed to get the additional oxygen form [sic] the

13  outside air.  Had he returned to the car, the medicine likely

14  would not have worked and the full-blown attack that he has

15  avoided so far might have happened."  (Id. at 14-15.)

16      This argument is unsupported by the record or expert

17  opinion.  Lin offered no testimony about the pharmacological

18  effects of the inhaler under the existing conditions at the

19  scene.  There is no testimony that the medicine would not have

20  worked had Lin returned to the minivan and rolled down the

21  window.  Additionally, there is no evidence that the outside air

22  had a greater oxygen content than the air inside the vehicle or,

23  even assuming such a scientific fact, that the window or door of

24  the minivan could not have been opened.  A "potential" for

25  imminent harm is not the same thing as imminent harm.  The

26  possibility of alleged adverse effects is not imminent harm.  The

question here is, on these facts, did Lin act to avoid an
*imminent* harm.  Lin admitted that he was "in trouble, but it
wasn't in real trouble, not in real, real, serious trouble."  (RT
175.)  Lin's testimony is insufficient to establish a defense of
necessity, which requires him to take action to prevent imminent
harm.

To the contrary, the evidence strongly supports the
conclusion that Lin was not acting to avoid imminent harm.  Lin's
behavior is wholly inconsistent with that of a person
experiencing a breathing emergency.  Ranger Grego, a paramedic,[8]
testified that "abbreviated speech is one of the first things
that you'll see" even in a mild or moderate case of asthma, and
that Lin's speech was normal, even yelling.  (RT 32.)  Ranger
Grego further testified that Lin's actions were "purposeful" and
inconsistent with someone experiencing a life-threatening asthma
attack.

Lin's conduct was also inconsistent with a threat of
imminent harm.  Despite that he was at an altitude of
approximately 8600 feet above sea level where the atmospheric
pressure is less (RT 71), Lin chose to exercise by walking down

---

[8] At trial, the magistrate judge referred to Grego as a "semi-
expert" regarding the symptoms of asthma.  RT 68.  Neither party
objected to this characterization.  Between Ranger Grego and Lin,
the former was the only witness who had any type of emergency
medical or healthcare training. Ranger Grego testified that he was
"very familiar" with the signs and symptoms of asthma because he
has worked as a paramedic, a flight paramedic, a mobile intensive
unit paramedic as well as having worked in emergency departments,
operating rooms, respiratory floors etc.  RT 31-32.

28

1  Tioga Road rather than standing still and trying to keep calm.

2  The normal protocol with an asthma patient according to the

3  rangers, all of whom have emergency medical training,[9] is to

4  keep the patient immobile.  Lin did not use his inhaler until he

5  had walked 75 feet away from the minivan.  This is inconsistent

6  with a person facing a threat of imminent harm.  Last, although

7  Lin claims that he was experiencing emergency symptoms from his

8  asthma attack from the outset of the encounter with Ranger Grego,

9  he did not immediately and clearly communicate his distress, say

10  "help!" or give any information to Ranger Grego that Lin was

11  having an asthma attack by saying "inhaler."

12       This last point is also relevant to the fourth factor, that

13  there was no other legal alternative to disobeying the order.

14  Lin could have, immediately on exiting the minivan, simply used

15  his inhaler.  Undoubtedly someone with Ranger Grego's extensive

16  emergency medical training would have immediately recognized the

17  situation.  Lin did not provide any reasonable or timely notice

18  of his alleged medical distress.  Instead, his conduct was

19  defiant and confrontational from the outset.  By contrast, Ranger

20  Grego was polite and endeavored to defuse the confrontation by

21

22       [9]  Ranger Grego testified that to treat a person experiencing
    problems with asthma he would try to prevent the person from
23  "increasing their oxygen demand" by calming them down and keeping
    them "nice and still."  (RT 33.)  Similarly, in response to the
24  Government's question of whether it was consistent for someone
    having asthma problems to take a walk in cold air, Ranger Harrison,
25  an EMT, testified that "people that have asthma need to just sit
    and just be quiet and take their medication.  Walking would - - it
26  seems like in high elevation area would make it worse."  (RT 89.)

1  using reasonable police practices to control a risky traffic

2  stop.

3       Lin totally failed to carry his burden with respect to

4  proving all of the elements of a necessity defense.  Ranger Grego

5  was entitled to rely on the totality of the objective

6  circumstances that confronted him.  He was not unreasonable in

7  trying to control Lin's unusual and resistive conduct by ordering

8  Lin back into the minivan.   The evidence does not support a

9  finding that Lin chose the lesser of two evils, acted to avoid an

10  imminent harm or that there was no legal alternative to

11  disobeying the order.

12

13  **VII.   <u>CONCLUSION</u>**

14       For all the reasons stated above, the judgment of conviction

15       is **AFFIRMED.**

16

17  **SO ORDERED.**

18

19  **DATED:  August 25, 2005**            **/s/ OLIVER W. WANGER**

20                                         _____

21                                              **Oliver W. Wanger**

22                                         **UNITED STATES DISTRICT JUDGE**

23

24

25

26

30